McClaren. Hear ye, hear ye. This Honorable Appellate Court for the Second District is now open. The Honorable Justice Robert D. McClaren presiding, along with Justice Anne B. Jorgensen and Justice Liam C. Brennan. The case is number 2180887, People of the State of Illinois, Plaintiff Appellee v. Lorenzo Kent Jr., Defendant Appellant. Arguing for the Appellant, Christopher McCoy. Arguing for the Appellee, David S. Friedland. Mr. McCoy, you may proceed. May it please the Court, Counsel, my name is Christopher McCoy from the Office of the State Appellate Defender, and I represent Mr. Lorenzo Kent. Your Honors, we raised several issues on appeal. There are two that I would like to focus on with my time right now. First, the sufficiency of the evidence, and second, the unavailability of Wesley Johnson. Regarding the sufficiency of the evidence, we acknowledge that we raised a similar issue in Mr. Kent's first appeal, and we acknowledge that this Court rejected that argument. However, that fact does not defeat the argument we're raising today for the simple reason that the State's evidence at the second trial was weaker than its evidence at the first trial. And what's more, the evidence at the first trial itself was far from overwhelming. Perhaps the best indication of this is regarding the other issue we raised in our first appeal regarding the Facebook evidence. In response to that argument, the State did not claim harmless error. They never argued that the evidence at the first trial was overwhelming. As this Court well knows, harmless error is a staple in the appellate prosecutor's playbook. The fact that the State didn't even attempt to make that argument shows just how close the evidence was at the first trial. Yet as I said, the State's evidence was even weaker at the second trial. Unlike the first trial, there was no Facebook evidence, there were no phone records, and both of these pieces of evidence in their own ways physically corroborated the State's witnesses. So the second trial, even more so than the first, really came down to a question of the jury having to believe what the State's two main witnesses, Genesis Burrell and Wesley Johnson, having to believe their testimony. Yet there were more reasons at the second trial to not believe their testimony. Perhaps the best example of this comes from Denise Gregory. She testified that she was sitting on the front porch at the time of the shooting, and she testified at the second trial that no one walked in front of the house at the time of the shooting. Of course, this contradicts Wesley Johnson's testimony, as he said that that's exactly what he did. And what's interesting for purposes of this argument is that Denise went from corroborating Wesley at the first trial to contradicting him at the second trial. Now, besides these changes between the first and second trials, there's just also an underlying unbelievability to what these two State's witnesses, their main witnesses, were testifying to. Wesley testified to seeing things that, according to other State's witnesses, were impossible for him to see, both based on the darkness and the physical layout of the house. Wesley was also contradicted by Genesis, who said that he was at home with her when the shooting occurred. So there's a situation here where both of the State's two main witnesses simply cannot both be believed. Turning to Genesis, her story too was simply unbelievable. She testified that she helped a man whom she literally had just met in his efforts to murder someone else when this man offered her nothing for her help, when this man did not threaten her. And yet she never told an adult about this for that entire day. Even when she hears gunshots in the neighborhood, she never tells an adult about what happened. Until the next day, and when she first tells someone, she's in the back of a squad car being picked up for a runaway. And even then, it's the police officer, not Genesis, who brings up the shooting first. Once Genesis starts talking, her story then constantly changes from her statement to the police officers, to the grand jury, to the first trial, and then again at the second trial. And these aren't just minor details. Major elements of her story are either omitted or changed significantly in these various retellings. And then on top of all of this unbelievability of the State's witnesses, there was evidence of a possible cause for the shooting that was unrelated to Mr. Kent. And that is the drug dealing that was occurring from the victim's home. There was drugs and paraphernalia found by the police in the backyard. And the next door neighbor saw people going through the victim's pockets after the shooting. Now, all of this is to say that we acknowledge witness credibility is generally left to the province of the jury. But because these witnesses were so unbelievable, this is one of the rare cases where no reasonable fact finder could find Mr. Kent guilty beyond a reasonable doubt. Therefore, this court should reverse his convictions outright. If this court does not do so, it still should remain the case for new trial based on the multiple trial errors that we've focused on in our brief. Today I'd like to just highlight one of those, and that being the unavailability of Wesley Johnson. The trial court erred in finding Wesley to be unavailable for two reasons. First, to show unavailability, the state must present evidence via either a testimony or an affidavit. Neither one of these occurred here. The prosecutor just made a statement giving sort of a vague outline of what investigators had done to try to locate Wesley. Interestingly, the state in its brief does not acknowledge this requirement of affidavit or testimony, let alone say how it was met. So ultimately, this court doesn't have to address the due diligence of the state's efforts because the state didn't even meet this threshold requirement. And the second reason the court erred was even if there was no requirement for an affidavit or testimony, the state still didn't show that it made reasonable efforts to locate Wesley. Unavailability is a narrow concept subject to rigorous standards, and the state just didn't meet those standards here. All the state did to find Wesley was to talk to his father. They didn't search official databases. They didn't look to see if he was going to school or had a job. They didn't talk to other people in the community to find out where he hangs out at. They didn't search for him on social media. They didn't even do something as simple as try to find his phone number and call him. And then the state didn't even check its own records to see that Wesley had an active criminal case in the same county. Despite being the only eyewitness to a murder, the prosecution didn't ask for a single continuance to get Wesley into court. And then, as I said before, the state didn't present affidavit or testimony. What they did was make a proffer, but that proffer itself occurred at a motion and eliminate hearing a week before trial. And there was just no evidence ever presented what happened in the week between this pretrial hearing and trial in terms of the state's efforts to locate Wesley. There has been, simply put, no case in Illinois where a witness has been found to be unavailable despite the state doing so little. A difficult parent shouldn't be an impossible hurdle for the state to overcome. Obstructing service of process is a criminal offense, and it seems like that Wesley was living inside this house. So perhaps arresting his father for obstructing service of process or even threatening to do so, that might have been enough to get Wesley to come to the door. But we have no evidence the state ever tried that. Finding unavailability here would essentially allow the state in future cases to choose to rely on prior testimony just because a witness becomes difficult. And, of course, the result at this trial was that the jury didn't get to see Wesley. They didn't get to evaluate his demeanor, which was especially important given how suspect his testimony was. And therefore, the court erred in admitting Wesley's prior testimony. And given the closeness of the evidence, which I discussed before, this error warranted a new trial. In conclusion, Mr. Kent respectfully requests that this court reverse his conviction outright or alternatively remand his case for a new trial. Thank you. Thank you. Justice Jorgensen, do you have any questions? Sure. Mr. McCoy, I mean, isn't the state really here between Iraq and a hard place? What else can they do if they can't find Wesley? Well, there was, I mean, several options just sort of off the top of the head of what they could have tried. Right. But do we know that they didn't do those things or do we just have to rely on what wasn't said in the proffer? Yes, essentially, the burden is on the state to prove its efforts. And again, that they didn't present the evidence in the correct forum. But but even then, you know what what they said they did was talk to Wesley's father multiple times. So, you know, it's possible that only twice they went to the house and and tried to talk to his father. I mean, they know, you know, I listed some other possible options that they could have done. But the burdens on the state and the state's proffer here just was insufficient to meet the rigorous standards of unavailability. Could we excuse that since the trial court seemed to suggest to the state that it would it being the trial court would be happy with a proffer? In other words, did the trial court excuse the state's obligation here? I don't believe so. I mean, this the court seems to be under a few misimpressions in this case in terms of what the state needed to present. And then sort of how much evidence they needed to present to to make a showing of unavailability. So the fact that, you know, the judge is wrong, I don't believe that that's, you know, makes it. That doesn't the court's not curing its own error, so to speak. All right. Justice McLaren, I have nothing else. Thank you. Thank you, Justice Brennan. Do you have any questions? I do. I'm going back to this, accepting that the state to meet its burden should provide an affidavit or sworn testimony along some line. The state throws that up there. The judge doesn't say anything. But neither does the defense. You don't object. You don't say, Judge, we want a proffer. Is there any argument that as it relates to that question, the sufficiency or how the evidence in support of the proffer that you forfeited that argument? No, I don't believe so. I would note that the state has not argued forfeiture regarding this unavailability argument at all. So so they have forfeited forfeiture. You know, if they had raised something in their brief, we could have responded in some way. But again, it's you know, it's it's not like the state didn't know about this requirement. As you said, they are the ones who bring up an affidavit or testimony and they just sort of drop the ball on coming going through with that. So they're aware or at least it appears they're aware of what they need to do and just fail to do that. You think there's any argument that if we agree that the admission of Wesley's prior testimony was error, what say you to the response that was harmless error? I don't believe that there's any way to find this harmless error. Wesley, as I said, is the only eyewitness to a first degree murder. He the state's evidence is very suspect to the obviously to the point where arguing it wasn't even sufficient to sustain the conviction. So if this testimony were not allowed, it can't be said that there's confidence in the jury's verdict. All right. Thank you very much. I have no additional questions. Justice McLaren. Thank you. I have no questions. Justice Jorgensen, do you have any questions in response to. I do not know. Thank you. Thank you. Mr. McCoy, you'll have an opportunity to make rebuttal. And Mr. Friedland, you may proceed. Thank you, Your Honor. Good morning, Your Honor's counsel. My name is David Friedland. I represent the people of the state of Illinois. May it please the court. Essentially, at the outset, defendants first claim challenging the sufficiency of the evidence really urges this court to compare the evidence at the two trials. However, there's no citation and no authority that really merits any such comparison. Looking at the evidence presented at this trial alone does overwhelmingly establish defendant's guilt and Your Honor should affirm his conviction and sentence. In the light most favorable to the people, the evidence showed that the defendant and the victim were in a fight two days before the murder where the defendant threatened the victim with a knife and he said he was going to kill him. Defendant's girlfriend, Kimiko Wilson, the mother of the victim's children was present at the fight, egging defendant on. Police responded to that fight, notified DCFS because the victim's children were present at the fight. And then the day after the fight, DCF took the victim's kids into protective custody from Kimiko Wilson's house. The day after that occurred, the defendant is in the park near the victim's house, upset about his kids being taken. And a reasonable inference to make is that he's referring to Kimiko Wilson's as his own kids. And Genesis Burrell sees the defendant in the park. He tells her about wanting to kill someone named Don. She sees him with a gun and bullets consistent with what is described by the firearms expert as a semi-automatic gun. And defendant's presence in the park is corroborated by Michaela Allen's testimony through her identification of him in the park. He's there shortly when it's dark, shortly before the shooting occurs. And all of that involves none of Wesley Johnson's testimony. But ultimately, Wesley Johnson's testimony was that the guy that was in the park shot the victim. So there's no question that the overwhelming evidence supports that this defendant shot the victim. And any inconsistencies in the testimony of the three child witnesses don't change those undisputed facts. A defendant can offer no explanation as to how the two girls identified him in the park, and how he, how Genesis knew the victim's name and the motive underlying the murder. And while motive is not required, it's certainly a powerful piece of evidence in this case. This is a classic motive means opportunity, and the evidence is sufficient to convict the defendant. I'll now turn to the defendant's argument regarding the admission of Wesley Johnson's testimony. Certainly, the defendant's argument that there's an affidavit or a sworn statement required for establishing unavailability does not appear in 804. From the people's research, it appeared in the first district case in People v. Hanson. That being said, the state offered a proffer. The trial court accepted the offer of the people's proffer of their efforts to try to serve Wesley Johnson. And what's required is whether the efforts were reasonable and done in good faith. The defense, the case was hold over. Any argument about that the trial, that the state should have proffered more or additional evidence as to what their specific efforts were required, was sort of short-circuited because the trial court intimated, they held the motion over for ruling, and the court then intimated that that motion was still outstanding. And both the defense counsel and the state believed that the trial court had previously granted it. The court indicated that they had intended to grant it. And therefore, any additional argument or proffer of anything else was really short-circuited by the agreement of the two parties as to what had occurred on the prior date. In this case, the efforts of the people were met with active hostile resistance. That was proffered to the court. And short of, could something more have been done? In any case, they could camp out outside of his residence. There's always something more that could be done. The question here is whether it was an abuse of discretion to find out what the state did was reasonable. And I simply don't believe that in this case, the trial court's decision to find that the state had used reasonable efforts was an abuse of discretion. Again, the people's noting the defendant's argument about the criminal case involving Wesley Johnson. Hello? Mr. Friedland, did we lose you? State proffered that they did not try to check the corridor or other reasonable places that they would normally check for unavailability. And so in this case, the state submits that the state engaged in reasonable good faith efforts. Mr. Friedland? Yes. You dropped out for about a minute. So could you repeat what you said in the last minute approximately? Can you hear me now? Yes. Okay. Justice, as given the time constraints, I will rest on the arguments that I put in my brief regarding Wesley Johnson's unavailability. I don't believe the trial court abused its discretion in finding what the state did was reasonable. And therefore, I'll rest on that argument and the remaining arguments in my brief and would accept any questions from the panel. Thank you. Justice Jorgensen, do you have any questions? I do. Mr. Friedland, what did the state do to try to get Wesley in court? Besides talk to his father? That's what the proffer was. The proffer indicated that what they didn't do was call the coroner's office or hospitals to try to figure out. They proffered that it was simply a... Mr. Friedland, the question was not what the state didn't do. What did they do? They attempted to serve Wesley at his residence. What was proffered was multiple occasions. I think it was more than once was the quote. Is that correct? Oh, Mr. Friedland, I think we've lost you again. I'll put us on pause, judges. If you could go back, you have dropped off again. My question was, what did the state do? And frankly, after the question, we couldn't hear you anymore. So if you could start over and gather your thoughts. The proffer that was given at the trial was that the investigators made contact with the family of Mr. Johnson more than once. That his father had been very hostile. That they avoided attempts of service for Wesley III. They refused to inform the investigators of where he is. And that they did believe that... reason to believe that Mr. Johnson did tend to be with the family. That there were attempts to serve people in the house, but they wouldn't answer the door. And tell me why that is a reasonable effort, given that we start with the right to confront all witnesses against you. Well, the reasonableness is judged on the facts of each individual case. They engaged in good faith efforts to try to serve him. They knew that he was there. Short of camping out there, which requires staying there overnight to try to get him when he goes in and out. Making multiple attempts to serve someone at their address can be considered reasonable. And was done so by the trial court. Okay, that's your position? Okay, what about the fact that there wasn't even a subpoena issued until six weeks prior to the jury trial? Can we consider the short term there? I think that six weeks is sufficient time for them to attempt to serve him. They had been attempting to serve Wesley Johnson. The motion in limine occurred six days prior to trial in seeking to admit the sworn testimony. The motion to try to attempt to have him declared unavailable was only made six days prior. Which was the subpoenas issued October 20th and the jury trial date was November 13th. I think that's a reasonable amount of time to serve him. Additionally, we would note that he was confronted at the first trial. We're talking about whether the sworn testimony needs to be admitted at the second trial. Counsel, there's no dispute over the first two factors. The question is whether he was unavailable. Right. Unavailable. What efforts were undertaken in the last week prior to the trial? In the last week? Yes, after the motion in limine had apparently been granted. Was there any other effort to try to secure Mr. Wesley's in-person attendance? Mr. Freeland, are you there? Yes. Okay, sorry. We just had lost you before. They proffered that they made contact with the family more than once. They had been hostile and they refused to inform the investigators of where he was. But they made multiple attempts at service. The question is was there any additional efforts made in the last week prior to the trial? No. Nothing was proffered. That was after he had been found unavailable. Okay. I have nothing else. Thank you. Thank you. Justice Brennan, do you have any questions? I do. Mr. Freeland, one of the times when you dropped off, you were discussing the issue of Wesley having a pending case. And we didn't hear your response. So I want to ask about that. It seems to me a pretty basic thing to do if you're trying to get the most important witness in your murder case served, that you look in the court records of your own jurisdiction and find out, hey, he has a pending case and he's appearing. Let's serve him in court. Is there a reason why that wouldn't be a basic, reasonable step to take? So two things, Your Honor. First, he was not appearing in court. His case, his criminal case, was completed and he was sentenced on October 12, 2017. And they issued the subpoenas out on October 20, 2020. The trial had been set, correct? Back in September? Yes. Additionally, they had the name on Wesley's and the defense counsel admitted this fact that the defendant, or Wesley Johnson's name, was different on the court case as it was on his actual name. That it was Wesley Johnson. By different, you mean the middle initial wasn't it? No, the number of the third or junior. He was Wesley Johnson III and the name was under Wesley Johnson. All right. Can I just address your harmless error argument in your brief? You would agree that if we conclude that Wesley's reasonable efforts were not employed to procure Wesley's attendance, that if we do conduct a harmless error analysis, when we do that, we have to excise Wesley's testimony in analyzing whether the evidence is sufficient in that context. Would you agree with that? Yes. And I would suggest, submit that in that context, Wesley did not identify at trial or at all, the defendant as the shooter. He didn't do it in open court and he didn't identify him as in a photo lineup. If you submit the testimony and motive evidence from Genesis Burrell and Michaela's corroborating identification, there's sufficient evidence here to sustain the conviction. Thank you. I have no additional questions. I have no questions. Justice Jorgensen, do you have any questions? I do not. Thank you very much. Thank you. Thank you, sir. Mr. McCoy, you may proceed with your rebuttal. Your honors. One point regarding the reasonable doubt arguments. Council says we're comparing the case between the first and second trial and the reason we're doing that is in response to the state's argument that they raised in our brief, in their brief, excuse me, that was because this court rejected a similar argument on the first appeal that they should reject the same argument here. And it was just, our argument is showing that that's not dispositive. The ruling in the first appeal is not dispositive on this appeal. Turning to unavailability, again, I would like to reiterate that any argument regarding the affidavit or testimony has been forfeited by the state because they did not raise this in their brief. They never once responded to our argument about that requirement. And without sworn testimony and affidavit, again, we're just left with this very nebulous statement from the prosecutor. We don't know exactly how many times the state went to Wesley's house. We don't know when those occur. We don't know what was said between the family or the father and the police officers or whoever was serving the subpoena. There's no paperwork on these unserved subpoena. And we don't really know exactly how the family or the father was avoiding service, as the prosecutor said. And again, the state never once asked for continuance. They never really tried anything except talking to this father twice. I mean, that's sort of the end and the beginning of the state's proffer. And it's just unreasonable to think that there was no other possible way to attempt to contact Wesley. Obviously, this was in pre-COVID, pre-quarantine time. So it's doubtful that Wesley was bunkered down in his house and no way for anyone to contact him. And then my final point is this, regarding harmless error, the state's argument that Wesley's testimony was unimportant. I mean, there's a disconnect between that argument and the argument council just made regarding reasonable doubt in which council just highlighted Wesley's testimony as one of the reasons to affirm Mr. Kent's conviction. Look at the state's closing argument and trial. They're focusing on Wesley's testimony. So it can't be said that the one eyewitness to a murder trial was that admitting his testimony was harmless. So again, Mr. Kent would ask that this court either reverse his conviction outright or remand the case for a new trial. Thank you. Thank you. Justice Jorgensen, do you have any questions? I have just a brief question. Mr. McCoy, are you in effect asking us to read into 804 the necessity for an affidavit or live testimony on presumably under oath as the first district determined in their case? Well, it's, I mean, this is backed up by case law. It's not, as I said, it's not in the exact language of the rule, but in the Hansen case that was found, also on the fourth district has found that in multiple cases, the Dukes case and the Kurt Bullock builders case, both of which were cited in our brief. So this has been other courts have found this requirement. So we're asking this court to to follow the existing case law. And in fact, I would just point these aren't controlling cases, but persuasive cases from Arizona, Iowa, and Hawaii that we cite in our in our opening brief as well for the support that just a prosecutor's unsworn statement is insufficient to prove unavailability as an exception to the confrontation clause. That's all I had. Thank you. Thank you, Justice Brennan. Do you have any questions? I do not. Thank you. Mr. McCoy, was defense counsel ever asked by either the prosecutor or the judge if the representations by the prosecutor were sufficient and that the defense counsel had no objection if the representations satisfied the requirement relative to testimony or affidavits? No, that question was never asked to defense counsel. Thank you. I have no further questions. Any other further questions? No, sir. Thank you. No, thank you. Thank you. Then I'm sorry. My phone just went off. Thank you. Thank you. And we'll take the case under advisement and we will render a disposition at nap time. Thank you, Mr. Clerk. You may close the proceedings. I will initiate the conference call.